**United States District Court**
**Eastern District of Michigan**
**Southern Division**

United States of America,                                    Criminal No. 17-20184

                          Plaintiff,                        Hon. Judith E. Levy

v.

D-4 Kevin Pearson,

                          Defendant.

_____/

## Government's Sentencing Memorandum

### I.   Introduction

Defendant Kevin Pearson pleaded guilty to RICO conspiracy because he is a long-time member of one of Detroit's most violent gangs—YNS. The gang has terrorized the beleaguered Brightmoor neighborhood for years, victimizing the poor and vulnerable to extract money and status. Pearson used social media to advance this violent criminal enterprise. He participated in violent robberies with guns, including the attempted robbery and murder of a 22-year-old man. He also sold drugs while armed with guns.

The Court should sentence Pearson to reflect the real damage he caused to YNS's victims, their families, and the community.

## II.   Facts

### *Pearson's gang activities include armed robbery and murder*

Pearson admitted to his key role in the violent YNS enterprise. (R. 470, 4970-78: Rule 11 plea agreement). His gang (1) "regularly committed robberies . . . while armed, but sometimes would commit unarmed robberies that involved beating their victims." (*Id.*).  They (2) would "break into houses or gain entry at gunpoint and rob victims in the victims' homes." (*Id.*). Pearson admitted that his gang (3) "especially encouraged its members to find firearms to steal, because such firearms could then be used by YNS for future acts of violence and to protect its drug trade." (*Id.*). Pearson's gang (4) "cultivated a reputation for ruthless violence" by "committing crimes including assault, arson, attempted murder, and murder." (*Id.*).

Here are a few examples of Pearson's promotion of the gang's violence. These are real guns, loaded, and ready for action.

 







The gang also promoted its violence in YouTube videos, including one entitled "Glo-Gang-Member YNS Cheeks – Mobbin with Da Mobb." In the video, the gang bragged about its violent grip on Brightmoor.

- "we killing anything that disrespect us"

- "we got this bitch on lock"

- "we got the killas everywhere"

- "we all strapped [armed with guns]"

- "we started shooting n*ggas up"

- "my gang members around here, we are everywhere"

- "YNS . . . now we running this bitch"

(R. 453: 1/28/2020 Trial Tr. 3495-96, Ex 24.001).

YNS used traditional gang promotion methods like tattoos (Pearson has several) and tagging playground equipment ("Y.N.S. the MOB" and "BMG").





But YNS was not pretending to be violent. One example of the reality behind their violent reputation was the summer of 2013, when codefendant Sontez Wells posted this photo of three YNS members—Wells, Kevin Pearson, and Andre Chattam. They all are throwing gang signs and Chattam is making a trigger finger.



Around the same time, on August 22, 2013, Wells, Pearson, and Chattam were driving a car through Brightmoor looking for a target. Wells and Pearson left the car and attempted to rob a man at a local gas station. (PSR ¶¶ 17-18). Wells shot several times and killed the man while Pearson was helping Wells to rob him. (*Id.*). During the robbery, the victim (a CPL holder) shot Wells. (*Id.*). After Wells and Pearson returned to the car, Chattam acted as the getaway driver. When they arrived at a local hospital, Wells used the name of a deceased YNS gang member. Within a day of the murder, Wells was with Pearson on social media throwing gang signs, and exclaiming "Mobb life!!"



Another example of the gang's violence was in 2014, when Pearson used a gun and "committed a robbery at the direction of another YNS member on Braile Street in the Brightmoor neighborhood of Detroit." (PSR ¶ 20).

These types of acts made (5) "YNS a group to be feared and not to be crossed[.]" (Rule 11). The gang (6) "strictly forbade any cooperation with law enforcement. Gang

leadership would confer with members facing charges in order to determine whether any other member might be 'snitching,' or cooperating." (*Id.*). The gang (7) "understood that, if they were to provide information about YNS to the police, they would not only lose standing in the gang but also be subject to violent retaliation up to and including death." (*Id.*).

### *After the murder, Pearson continued with the gang and witness tampering*

Pearson actively engaged in witness tampering after the gang's brutal July 4, 2015 murder of a random woman at the Victory Inn hotel in the gang's territory. (R. 487: 2/19/2020 Trial Tr., 5625-40, Ex 23.001A-D). He did this after learning of the horrific nature of the gang's murder of the woman, captured in part on the 911 call. (R. 487: 2/21/2020 Trial Tr., 5584, Ex 21.005).

### *Pearson and YNS sold drugs*

YNS existed to enrich its members through unlawful means. (Rule 11, ¶ 1.C). Members of YNS engaged in drug trafficking and earned substantial revenues from drug sales. (*Id.*). YNS members sold drugs including marijuana, cocaine, cocaine base, heroin, and prescription pills. (*Id.*). The gang frequently used vacant houses as bases of operation for drug sales, referring to such locations as "trap houses" and stocking them with firearms, ammunition, YNS paraphernalia, and large quantities of drugs. (*Id.*). Pearson admitted to selling drugs. (*Id.*).  In 2013, 2014 and 2015, Pearson carried loaded guns while he distributed marijuana and crack cocaine with YNS members from several residences in Brightmoor. (PSR ¶ 19).

*Other trial evidence*

The trial of Pearson's remaining codefendants began January 27, 2020. (1/27/2020 Minute entry). On March 12, 2020 after the seventh week of trial, his codefendants pleaded guilty to the RICO conspiracy. (R. 506: Plea Hr. Tr.). During trial, the government presented dozens of witnesses and hundreds of exhibits detailing the gang's murders, shootings, armed robberies, arsons, home invasions, practice of witness intimidation and obstruction, and extensive drug dealing. During trial, the evidence proved that Pearson repeatedly possessed loaded firearms and made threats to promote the enterprise, and that he participated in home invasions and armed robberies, including one where he and other gang members murdered an unarmed young man. (R. 470: 2/13/2020 Trial Tr.; R. 471: 2/14/2020 Trial Tr.).

## III.   Advisory Sentencing Guidelines

The parties agreed in the Rule 11 that Pearson's Guidelines range was 360 months to life in prison (total offense level 42, criminal history category II). (Rule 11, Guideline Worksheet D). The probation department found a total offense level of 40 and a criminal history category III, resulting in the same Guidelines range. (PSR ¶ 101). The Rule 11 caps the sentence at 360 months (30 years). (Rule 11, ¶ 3A).

## IV.   Sentencing Guidelines and other 3553(a) factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence

to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors are evaluated below.

## A.    The advisory Guidelines range

The advisory Guidelines remain an important factor in sentencing. "[I]t is fair to assume that the Guidelines . . . reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 345 (2007). A district court should begin sentencing proceedings by correctly calculating the guidelines. *United States v. Gall*, 128 S. Ct. 586, 596 (2007).

## B.    Nature and circumstances of the offense, and the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1)

### 1.    Nature of the offense

YNS is a violent street gang that "promote[d] its violent reputation through social media posts[.]" (Rule 11, ¶ 1.C). Pearson is a longtime member. With his help, YNS purposefully developed its ruthless by committing violent acts. YNS's domination of the neighborhood caused Brightmoor residents to live in fear of shootings, robberies, beatings, and arson. YNS forced the community to endure violence, and the regular use of neighborhood businesses and residences as drug markets, because the gang will not tolerate interference with its members' revenues or threats to its dominance.

Like all YNS members, Pearson is responsible for the foreseeable acts committed by the other members to advance the conspiracy. *United States v. Nicholson*, 716 F. App'x 400, 409 (6th Cir. 2017), c*ert. denied*, 138 S. Ct. 1337 (2018) (applying *Pinkerton v. United States*, 328 U.S. 640, 646-48, (1946) to RICO coconspirators). *See also United States v. Corrado*, 286 F.3d 934, 937 (6th Cir. 2002) (in a "RICO enterprise . . . 'the supporters are as guilty as the perpetrators . . . so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators.'") (quoting *Salinas v. United States*, 522 U.S. 52, 63-64 (1997)). This includes countless acts of violence and drug dealing.

Just two of Pearson's violent episodes—the 2013 murder and the strong-armed robbery on Braile—illustrate YNS's impact. YNS killed one young man at a gas station and Pearson brutally assaulted another man to take his cash at a dice game. Both of his victims were random. These are exactly the harms that "contribut[e] to the economic and social decline of [gang-dominated] neighborhoods" and "caus[e] fear and lifestyle changes among law-abiding residents." *City of Chicago v. Morales*, 527 U.S. 41, 98-99 (1999) (Thomas, J. dissenting) (quoting U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Assistance, Monograph: Urban Street Gang Enforcement 3 (1997)). "Gangs fill the daily lives of many of our poorest and most vulnerable citizens with a terror . . . often relegating them to the status of prisoners in their own homes." *Id.* (citing U.S. Dept. of Justice, Attorney General's Report to the President, Coordinated Approach to the Challenge of Gang Violence: A Progress Report 1 (Apr.1996)) ("[For] the families who are hostages within their homes, living in neighborhoods ruled by predatory drug trafficking gangs, the harmful impact of gang violence . . . is both

physically and psychologically debilitating"). As the PSR noted, "YNS terrorized and violated the Brightmoor neighborhood for years. In addition, narcotics trafficking destroys neighborhoods and communities with the violence and addictions it brings." PSR ¶ 117.

The residents of Brightmoor were the primary victims of YNS's violent dominion throughout the decade-long racketeering conspiracy. This a vulnerable neighborhood that has suffered tremendous population loss and is one of the poorest neighborhoods in Detroit.[1]  One 2016 article noted the contrast between the developing areas of Detroit and Brightmoor and found that "[e]ven with a depleted population, crime is still a big issue in this neighborhood[.]"[2] Pearson's conduct, and of the gang members under his leadership, contributed directly to Brightmoor's high crime rate and its status as "one of the most blighted areas in Detroit."[3]

## 2.      History and characteristics

At the age of 27, Pearson has already compiled a significant criminal history. Here, he pleaded guilty to a RICO conspiracy centered on violence and drug distribution. YNS

---

[1] *See* Data Driven Detroit, *Brightmoor Neighborhood Profile* (April 2012). https://ssw.umich.edu/sites/default/files/documents/research/projects/good-neighborhoods/brightmoor-profile-2013-081913.pdf

[2] *See* "*Detroit's most dangerous neighborhoods still struggling during city's comeback*" (February 17, 2016). https://www.mlive.com/news/index.ssf/2016/02/detroits_most_dangerous_neighb.html

[3] *See* "*Detroit area's battle with blight may be key to survival*" (July 25, 2013). https://www.reuters.com/article/us-usa-detroit-blight/detroit-areas-battle-with-blight-may-be-key-to-survival-idUSBRE96O02T20130725

has committed a host of violent crimes, including murder, robbery, and arson. These are not his only crimes and convictions.

Pearson has several juvenile convictions. (PSR ¶¶ 58-60). He also has six adult convictions, including carrying a concealed weapon in 2015. (*Id.*, ¶¶ 61-66). Police arrested him another ten times and he was on probation when he committed many of the crimes in this case. (*Id.*, ¶¶ 71-81).

## C.    Seriousness of the offense, promoting respect for law, and providing just punishment, 18 USC § 3553(a)(2)(A)

The advisory Guidelines create a range so the courts can sentence similar defendants appropriately based upon the severity of their conduct. Pearson is a self-proclaimed member of one of Detroit's most violent street gangs. He participated in the armed robbery and murder a random person during a YNS armed robbery. This is the most serious crime, but not his only violent crime. He also pistol-whipped and robbed a random man.

## D.    Adequate deterrence and protecting the public from further crimes of the defendant, §3553(a)(2)(B) and (C)

Deterrence is especially important in this case. In the past, courts gave Pearson breaks and he has served little time considering his criminal history. He responded by committing new crimes while Brightmoor suffered. The most troubling example is the sequence of events following the 2013 murder. The court should impose a sentence that protects the public generally—and the people of Brightmoor specifically. The court must deter Pearson from guns, drugs, violent robberies, shootings, and his role in the decade-long YNS criminal enterprise.

**V.      Conclusion**

The government recommends that the Court impose a sentence to reflect the loss of life at his hands, and the real damage he caused to YNS's victims, their families, and the community.

<div style="margin-left: 40%;">

Matthew Schneider
United States Attorney

*s/Jerome F. Gorgon Jr.*
JEROME F. GORGON JR.
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9676
jerome.gorgon@usdoj.gov

</div>

Dated: June 16, 2020

## Certificate of Service

I hereby certify that on June 16, 2020, I electronically filed the foregoing document under seal with the Clerk of the Court and will provide a copy of such filing to the attorneys of record, David Steingold.

*/s Jerome F. Gorgon Jr.*
JEROME F. GORGON JR.
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9676
jerome.gorgon@usdoj.gov